4-09-00282-CR

*** IN THE COURT OF APPEALS
AT SAN ANTONIO, TEXAS

04-08-00312-CR

2009 NOV 17 PM 12: 47

Keith E. Hottle

KEITH E. HOTTLE, CLERK

## In the Fourth Court of Appeals
### San Antonio, Texas

## ROBERT BAEZ CRUZ

Appellant

*ORIGINAL*

VS.

## THE STATE OF TEXAS,

Appellee

On Appeal from the 186TH Judicial District Court
### Bexar County, Texas
2008-CR-5916B

Appellant's Brief

Suzanne Kramer
101 Stumberg
San Antonio, Texas 78204



11/16/2009
US POSTAGE   $11.20
ZIP 78205
041L11206770

\* \* \*

04-08-00312-CR

---

In the Fourth Court of Appeals
San Antonio, Texas

---

ROBERT BAEZ CRUZ

Appellant

VS.

THE STATE OF TEXAS,

Appellee

---

On Appeal from the 186TH Judicial District Court
Bexar County, Texas
2008-CR-5916B

Appellant's Brief

---

Suzanne Kramer
101 Stumberg
San Antonio, Texas 78204

# IDENTITY OF PARTIES AND COUNSEL

## Honorable George Godwin - sitting by assignment

### Trial Counsel:

Assistant District Attorney
Mary Green
Emily Angulo
300 Dolorosa
San Antonio, Texas 78205

### Defense Counsel:

Shawn Brown
Neil Calfas
540 S. St. Mary's
San Antonio, Texas 78205

### Appellate Counsel:

Suzanne Kramer - for Appellant
101 Stumberg
San Antonio, Texas 78204

Susan Reed - District Attorney
300 Dolorosa
San Antonio, Texas 78205

ii

## TABLE OF CONTENTS

PAGE

Identity of the Parties ...... ii

Table of Contents ...... iii

Index of Authorities ...... iv-vii

Points of Error Asserted ...... vii
   Number One - The trial court abused its discretion in failing to suppress the Appellant's DVD statement.
   Number Two - The trial court abused its discretion in allowing the jury to hearing the Appellant referencing discussions with his attorneys concerning the case.
   Number Three - The trial court abused its discretion in failing to grant the motion for directed verdict.
   Number Four - The trial court abused its discretion in allowing extraneous offense evidence
   Number Five - - The State was allowed to engage in improper bolstering of their expert witness.

Statement of the Case ...... 1

Summary of the Argument ...... 1-2

Statement of the Facts ...... 2-6

Point of Error Number One ...... 6-13

Point of Error Number Two ...... 13-15

Point of Error Number Three ...... 15-35

Point of Error Number Four ...... 35-43

Point of Error Number Five ...... 44-46

Prayer ...... 46

Signature Line ...... 46

Certificate of Service ...... 47

## INDEX OF AUTHORITIES

**CASE NAME**                                                                                          **PAGE**

Adelman v. State, 828 S.W. 2nd 418 (Tx.Cr.App.1992)                                                     31

Alexander v. State, 88 S.W. 3rd 772 (Tex. App.--Corpus Christi 2002, pet. ref'd)                        39

Arizona v. Roberson, 486 U.S. 675, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988)                              36

Ashcraft v. Tennessee, 322 U.S. 143, 64 S.Ct. 921, 88 L.Ed. 1192 (1944)                                12

Blackburn v. Alabama, 361 U.S. 199, 80 S.Ct. 274, 4 L.Ed. 2nd 242 (1960)                               12

Burks v. State, 876 S.W. 2nd 877 (Tx.Cr.App.1994), cert. denied                                         35
    513 U.S. 1114, 115 S.Ct. 909, 130 L.Ed. 2nd 791 (1995)

Camacho v. State, 864 S.W. 2nd 524 (Tx.Cr.App. 1993)                                                    43

Carter v. State, 145 S.W. 3rd 702 (Tex.App. --Dallas, 2004)                                             44

Chapman v. State, 470 S.W. 2nd 656 (Tx.Cr.App.1971)                                                     32

Cox v. State, 830 S.W. 2nd 609 (Tx.Cr.App.1992)                                                         35

Culombe v. Connecticut, 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed. 2nd 1037 (1961)                           12

Davidson v. State, 25 S.W. 3rd 183 (Tx.Cr.App. en banc 2000)                                            10

Davis v. North Carolina, 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed. 2nd 895 (1966)                          12

DeBlanc v. State, 799 S.W. 2nd 701 (Tx.Cr.App.1990)                                                     32, 34

Dewberry v. State, 4 S.W. 3rd 735 (Tx.Cr.App.1999)                                                      30

Edwards v. State, 427 S.W. 2nd 629 (Tx.Cr.App.1968)                                                     35

Fowler v. State, 958 S.W. 2nd 853 (Tex. App.--Waco 1997)                                                42
    aff'd, 991 S.W. 2nd 258 (Tx.Cr.App. 1999)

Garcia v. State, 919 S.W. 2nd 370 (Tx.Cr.App. 1994)                                                     9, 11

## INDEX OF AUTHORITIES (Cont.)

| CASE NAME | PAGE |
|---|---|
| Granger v. State, 683 S.W. 2nd 387 (Tx.Cr.App.1984), cert. denied 472 U.S. 1012, 105 S.Ct. 2713, 86 L.Ed. 2nd 728 (1985) | 35 |
| Greenwald v. Wisconsin, 390 U.S. 519, 88 S.Ct. 1152, 20 L.Ed. 2nd 77 (1968) | 12 |
| Hankton v. State, 25 S.W. 3rd 540 (Tex. App. --Houston [1st Dist.] 2000) | 44 |
| Hardie v. State, 807 S.W. 2nd 319 (Tx.Cr.App.1991) | 14, 15 |
| Haynes v. Washington, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed. 2nd 513 (1963) | 12 |
| Heiman v. State, 923 S.W. 2nd 622 (Tex.App.--Houston [1st Dist.] 1995, pet. ref'd) | 43 |
| Herndon v. State, 787 S.W. 2nd 408 (Tx.Cr.App.1990) | 31 |
| Hodge v. State, 940 S.W. 2nd 316 (Tex.App.-- Eastland 1997, pet. ref'd.) | 43 |
| Horton v. State, 986 S.W. 2nd 297 (Tex. App.--Waco 1999, no pet.) | 42 |
| Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed. 2nd 560 (1979) | 31 |
| Jackson v. State, 968 S.W. 2nd 495 (Tex.App.--Texarkana 1998, pet. ref'd) | 10 |
| Johnson v. State, 864 S.W. 2nd 708 (Tex.App.--Dallas 1993) | 10 |
| Johnson v. State, 737 S.W. 2nd 901 (Tex.App.-- Beaumont 1987 judgment and sentence affirmed as reformed in 784 S.W. 2nd 47 (Tx.Cr.App.1990) | 45 |
| Johnson v. State, 23 S.W. 3rd 1 (Tx.Cr.App.2000) | 30 |
| Johnson v. State, 871 S.W. 2nd 183 (Tx.Cr.App.1993), cert. denied 511 U.S. 1046, 114 S.Ct. 1579, 128 L.Ed. 2nd 222 (1994) | 31 |
| Jones v. State, 944 S.W. 2nd 642 (Tx.Cr.App.1996) | 12 |
| Jones v. State, 982 S.W. 2nd 386 (Tx.Cr.App.1998) | 33 |

## INDEX OF AUTHORITIES (Cont.)

| CASE NAME | PAGE |
|---|---|
| King v. State, 953 S.W. 2nd 266 (Tx.Cr.App. 1997) | 42 |
| Kutzner v. State, 994 S.W. 2nd 187 (Tx.Cr.App.1999) | 33 |
| McDuff v. State, 939 S.W. 2nd 607 (Tx.Cr.App.1997), cert. denied 522 U.S. 844, 118 S.Ct. 125,139 L.Ed. 2nd 75 (1997) | 30 |
| McFarland v. State, 928 S.W. 2nd 482 (Tx.Cr.App.1996), cert. denied 519 U.S. 1119, 117 S.Ct. 966, 136 L.Ed. 2nd 851 (1997) | 33 |
| Munoz v. State, 853 S.W. 2nd 558 (Tx.Cr.App.1993) | 32, 34, 35 |
| Oliver v. State, 29 S.W. 3rd 190 (Tex.App. –San Antonio, 2000) | 9 |
| Paredes v. State, 129 S.W. 3rd 530 (Tx.Cr.App.2004) | 33 |
| Paulus v. State, 633 S.W. 2nd 827 (Tx.Cr.App.1981) | 32 |
| Pless v. State, 576 S.W. 2nd 83 (Tx.Cr.App.1979) | 45 |
| Reese v. State, 33 S.W. 3rd 238 (Tx.Cr.App.2000) | 41, 42 |
| Reyes v. State, 69 S.W. 3rd 725 (Tex.App.-- Corpus Christ, 2002) | 39, 40 |
| Rousseau v. State, 855 S.W. 2nd 666 (Tx.Cr.App.), cert. denied 510 U.S. 919, 114 S.Ct. 313, 126 L.Ed. 2nd 260 (1993) | 46 |
| Skillern v. State, 890 S.W. 2nd 849 (Tex.App.--Austin 1994, pet. ref'd) | 31 |
| Sontag v. State, 841 S.W. 2nd 889 (Tex.App. –Corpus Christi, 1992) | 14 |
| Trevino v. State, 991 S.W. 2nd 849 (Tx.Cr.App. 1999) | 5 |
| United States v. Preston, 608 F. 2nd 626 (5th Cir.1979) | 409 |
| Vasquez v. State, 67 S.W. 3rd 2296 (Tx.Cr.App.2002) | 33 |
| Villalon v. State, 791 S.W. 2nd 130 (Tx.Cr.App.1990) | 31 |

vi

## INDEX OF AUTHORITIES (Cont.)

**CASE NAME**                                                      **PAGE**

Walker v. State, 615 S.W. 2nd 728 (Tx.Cr.App.1981)                  32

Weatherred v. State, 15 S.W. 3rd 540 (Tx.Cr.App. 2000)              5

Williams v. State, 937 S.W. 2nd 479 (Tx.Cr.App.1996)               30

Williams v. State, 927 S.W. 2nd 752 (Tex.App. – El Paso, 1996)     46

Xu v. State, 191 S.W. 3rd 210 (Tex.App. –San Antonio, 2006)        10

## POINTS OF ERROR ASSERTED

### NUMBER ONE

The trial court abused its discretion when it failed to suppress the Appellant's DVD statement in that it was involuntary because he was never contemporaneously provided with the complete statutorily required language of 38.22 of the Texas Code of Criminal Procedure, and was obtained in violation of United States and Texas constitutional provisions.

### NUMBER TWO

The trial court abused its discretion when it allowed the jury to hear the Appellant referencing discussions with his attorneys, in violation of the 6th and 14th Amendments to the United States Constitution and Article 1 Section 10 of the Texas Constitution.

### NUMBER THREE

The trial court abused its discretion in denying the Appellant's motion for an instructed verdict because the evidence was insufficient to support conviction of the offense as charged.

### NUMBER FOUR

The trial court abused its discretion when it allowed evidence of an extraneous offense, i.e. a prior shooting attempt of the complainant, as well as weapon and narcotic evidence in the guilt innocence phase of the trial, as proof of motive and being contextual, in violation of Rules 403 and 404(b) of the Texas Rules of Evidence, the 6th and 14th Amendments to the United States Constitution and Article 1, Section 10 of the Texas Constitution.

### NUMBER FIVE

The State was allowed to engage in the improper bolstering of their witnesses, in violation of the 6th and 14th Amendments to the United States Constitution and Article 1, Section 10 of the Texas Constitution.

vii

## STATEMENT OF THE CASE

On July 14, 2008, Robert Baez Cruz, the Appellant in this case, was indicted in a two-paragraph indictment for the offense of murder alleged to have occurred on or about March 5, 2007.  (C.R. pgs. 10-11) The jury commenced April 14, 2009 with the jury returning a verdict of guilty of murder on April 20, 2009.  (R.R. v. 7, p. 98) The jury returned a sentence of life I the Texas Department of Criminal Justice, Institutional Division, with a $10,000.00 fine on April 21, 2009.  (R.R. v. 9, p. 162) Notice of Appeal was filed May 19, 2009. (C.R. pgs. 210-211)

## SUMMARY OF THE ARGUMENT

Although there are several points of error asserted in this brief, the main issue is that the State's accomplice witness testimony was never sufficiently corroborated and the State failed improving that Cruz was guilty to murder as a party.  There was an exceptionally prejudicial piece of evidence, in the form of a prior shooting attempt against the complainant, that was erroneously admitted.  It is very probable that this had a great deal to do with the ultimate conviction for murder.  Finally, the State inappropriately allowed the actual shooter to testify under a grant of immunity and another witness, who obviously shared the same level of guilt for the aggravated assault as Cruz, to testify pursuant to a third degree plea bargain.

## STATEMENT OF THE FACTS

Robert Cruz was charged with murder in a two-paragraph indictment. (C.R. pgs. 10-11) The first paragraph read that on or about March 5, 2007, the defendant did intentionally and knowingly cause the death of Corey Baxter by shooting him with a deadly weapon, namely, a firearm; AND by striking the complainant with a bat; AND striking with the hand of the defendant; AND kicking with the foot of the defendant; AND by striking the complainant with a stick; AND by striking the complainant with a brick; AND by striking the complainant with an object unknown.

Paragraph B read that on or about March 5, 2007, with intent to cause serious bodily injury, the defendant did commit an act clearly dangerous to human life that caused the death of the complainant by shooting; AND striking with a bat; AND striking with his hand; AND kicking with his foot; AND striking with a stick; AND striking with a club; AND striking with an object unknown. (R.R. v. 3, pgs 3-5)

In the early morning hours of March 5, 2007, the police were called to Gibbs-Sprawl and Walzem Roads. A passerby had seen what they believed was a body dumped out in the open field behind a Mexican Restaurant. The complainant was wrapped in several layers of tarp, carpet and miscellaneous cardboard. (R.R. v. 3, p. 6) As anonymous Crime Stopper tips began to come in, several names were recurring. These names were Dopey - Rudy Hettler  - SX 107, Sushi - Brian Cyr - SX 101, No Good - Robert Cruz - SX 106, Lupe - Guadalupe Villarreal - SX 103, Bear - Michael Yaws - SX 105 and Clifford Vansyckle - SX

102. (R.R. v. 4, p. 17)

The facts of all of the points of error are intricately intertwined so they will be discussed in the specific points of error. It would be too repetitive to discuss them in any detail in this section. Suffice it to say that the house on Chelmsford where the murder occurred was a drug house, where people went to use methamphetamine and to purchase methamphetamine. (Meth) (R.R. v. 3, p. 8; v. 4, p. 25) Further, in the three days before the death of Baxter, Chelmsford had been the location of two other beatings, that of Brandon Sprouse and Dane Batterton, the shooter in our case. (R.R. v. 3, p. 8; v. 4, p. 25; SX 326, 327, 328 - pics of Sprouse; Batterton - (R.R. v. 3, p. 8; v. 4, p. 25)

The State put forth several purported motivations for the murder of Baxter through the improper use of hearsay and extraneous offense evidence. It is clear that only Brian Cyr, a.k.a. Sushi, intended the murder. The "disciplinings" of Sprouse and Batterton were very similar to the beating that Baxter endured, except for the fact that Cyr wanted Baxter dead, a fact unknown to the other participants in the assault. Dane Batterton, the actual shooter, was allowed immunity from the prosecution because Detective Bradley had provided him with the language that allowed him to utilize the defense of duress. Jonathan Boyer placed Michael Yaws as guarding the doors inside the house so that Batterton would not be allowed to leave, however that is an untrue statement because Yaws was on most, if not all, of the videos taking place in the garage, participating in the assault and eventual murder of Baxter. The rest of the State's witnesses testified that no one was guarding Batterton. Batterton's

3

testimony revealed that no one was guarding him.

As far as the murder charge against Cruz, the State provided no independent evidence to establish that Cruz was guilty of anything more than aggravated assault. All the witnesses were accomplice witnesses, whether they were charged or not. Detective Bradley admitted that Batterton could have been charged with murder. (R.R. v. 4, p. 87) The only person who said that Vansyckle was not involved in the assault on Baxter was Vansyckle. Every other State witness, who was present in the garage, has Vansyckle participating in the assault. It seems odd that the State would simply take Vansyckle's word that he was not involved when all the other evidence, including the video clips, indicates the contrary. The video clips indicate Vansyckle was present in the garage with Baxter. Vansyckle testified that he saw Cruz hit Baxter in the head with a tire thumper, but not with a baseball bat. Boyer testified that he saw Cruz hit Baxter with a bat. Further, Boyer and Cyr both testified that Vansyckle was taking part in the kicking and hitting of Baxter, similar to Cruz's participation. Although Boyer does not admit to touching Baxter, there was testimony from the State's witnesses that Boyer participated, as did Vansyckle, in the assault on Baxter as much as Cruz did. Further, we know that Vansyckle and Cruz had left the house hours before Batterton shot and killed Baxter. Boyer was still at the house, although he says he was not in the garage, if that can be believed. All of the State's witnesses had profound motivations to lie, and the State seemed to take at face value their testimony to be  truthful, when the whole of the trial

testimony indicated otherwise.[1]   The only person who realized no benefit in testifying was

Brian Cyr, who had been sentenced to life in prison. By waiving his 5th Amendment rights,

all hopes of a meritorious appeal were dashed.  Cyr did not testify at his own trial, but made

the decision to waive his 5th Amendment rights and testify at Cruz's trial even before his own

trial because he believed the State's witnesses were lying. (R.R. v. 6, pgs. 220, 230) Cyr had

decided to kill the complainant earlier in the day.  Cyr shared that with no one and he neither

forced nor ordered Batterton to kill the complainant. Batterton testified as much.  (R.R. v. 6,

p. 42)

Cyr and Yaws then took Baxter's body and left in the field off of Gibbs-Sprawl Road.

(R.R. v. 6, p. 109)

## General Abuse of Discretion Standard of Review

Admissibility of evidence issues are reviewed under an abuse of discretion standard

of review. *Weatherred v. State*, 15 S.W. 3rd 540, 542 (Tx.Cr.App. 2000). The trial court will

not be overturned as long as its ruling is within the zone of  reasonable disagreement. *Id*.

If the trial court's evidentiary ruling is reasonably supported by the record and is correct

under any applicable theory of law, it must be upheld. *Trevino v. State*, 991 S.W. 2nd 849, 855

(Tx.Cr.App. 1999). This is true even when the trial court gives the wrong reason for its

---

1 Specifically, the testimony of Clifford Vansyckle and Dane Batterton was greatly impeached by
John Boyer and Brian Cyr.  Vansyckle was given a plea bargain of attempted aggravated assault,
in the face of evidence that he participated in the beating of the complainant, and Dane Batterton
was granted immunity, although his purported defense of duress in the shooting of the
complainant was profoundly impeached by uncontroverted testimony.

decision. *Romero v. State*, 800 S.W. 2nd 539, 543 (Tx.Cr.App. 1990).

## POINT OF ERROR NUMBER ONE

The trial court abused its discretion when it failed to suppress the Appellant's DVD statement in that it was involuntary because he was never contemporaneously provided with the complete statutorily required language of 38.22 of the Texas Code of Criminal Procedure, and was obtained in violation of United States and Texas constitutional provisions.

### Specific Facts

Detective Bradley took a videotaped statement from Cruz.  (R.R. v. 4, p. 41) The record indicates that the defense attorneys had not viewed the DVD statement nor had they viewed the redacted DVD statement until they requested to do so at the time the State offered the statement.  No pre-trial hearing on this issue was heard.[2]  Begrudgingly, the trial court removed the jury for a motion to suppress hearing.[3]  (R.R. v. 4, p. 42)

On the redacted DVD, Cruz invoked his right to counsel.  Bradley says that Cruz invoked after answering questions about the instant murder but before he started asking him questions about another murder.[4]  (R.R. v. 4, p. 46; SX 160, 160A)  Bradley believed that Cruz was high on methamphetamine during the interview and had not slept for three to four days. Notwithstanding, he believed Cruz knowingly and voluntarily waived his rights. (R.R.

---

2The record also indicates that the defense did not view the DVD statements of any of the co-defendants.

3For purposes of the motion to suppress hearing and trial, SX 160 is the original DVD statement and SX 160A is the redacted version.

4The defense made note that no Miranda warnings had been provided prior to the taking of the videotaped statement.

v. 4, p. 47) Before his rights could be read, Cruz indicated he understood them (SX 160A -

12:26:07 a.m.)  Later when the warnings were read from the 66E rights card, Bradley only

inquired of Cruz if he understood his rights, to which Cruz merely nodded.  (R.R. v. 4, p. 51)

There was no further affirmative verbal **waiver** of his rights. Bradley believed that Cruz

knew what was going on because he had mentioned the need for consulting an attorney.

Bradley did not believe this was an actual invocation of his rights, however.  Specifically,

"He said he had spoken to an attorney to find out what was going on.  He never said he

wanted an attorney." It would appear that if Cruz had already spoken to an attorney, then he

was represented by counsel.[5]  (R.R. v. 4, p. 48) The State implied that he spoke to his two

attorneys on an unrelated matter.  However, a review of the DVD indicates that the two

attorneys Cruz spoke to were representing him on an unrelated matter but he was clearly

speaking to them about what to do about this murder. (SX 160A - 12:49:06; R.R. v. 4, p. 56)[6]

At 12:58:03, the DVD indicates yet another reference to Cruz's attorney. It seems apparent

that whatever was said before was redacted, but the word "attorney" did not get cut out.  The

jury heard all of this. A review of the DVD indicates that Cruz's speech is exceptionally

slurred, to the point that Bradley has to continuously request Cruz to repeat what he had just

said.  Further, Cruz was obviously having a hard time maintaining his train of thought.

---

[5] The record indicates that the attorneys Cruz had spoken to were Sean Brown and Jack
McGinnis.

[6] The defense argued that this was more prejudicial than probative, and referenced bad acts with
improper notice.

Bradley had previously testified that all of these methamphetamine addicts could not keep a logical train of thought. Bradley was aware that Cruz was under the influence at the time but believed, in this instance, Cruz was fully coherent.[7] (R.R. v. 4, p. 50)

The defense argued that Cruz was already handcuffed and arrested and was being questioned before any Miranda warnings were provided, violating the 4th, 14th, 5th, 15th, Article 1, Section 9, 10, 38.22 and 38.23. (R.R. v. 4, p. 54) After the statutory warnings were provided, Cruz did not affirmatively waive his right to counsel. Further, Cruz, being high on meth, had not slept for three to four days and had been kicked in the head by Marshal Vincent Bellino.[8] (R.R. v. 4, p. 90)

The State argued that a verbal acknowledgment is sufficient. However, there was no acknowledgment as to the waiver of the rights because he was never asked to waive his rights. (R.R. v. 4, p. 58) Under the circumstances where Bradley was dealing with an obviously intoxicated person who had also been kicked in the head, it would be profoundly inappropriate to find an inferred waiver. The defense argued that the standard is not whether his words are understandable but whether Cruz knowingly, intelligently and voluntarily waived his rights.[9] The trial court denied the motion to suppress, however, he sternly

---

[7]The exhibit record does not contain a copy of the unredacted version of the DVD statement because it would not copy. Further, SX 160A contained in the clerk's record stopped at 12:58:40 minutes when the DVD reflects it is an approximately a 33 minute long statement.

[8]The DVD reflects Cruz holding his bottle of water up to his head for relief. (SX 160A 12:50:46)

[9] Further, it was argued that the expletives being utilized by Cruz violated Rules 401, 402, 403, and 404(b) (R.R. v. 4, p. 59)

admonished Detective Bradley "not to blow it - I won't tolerate any more foolishness anymore."[10]

## ARGUMENTS AND AUTHORITIES

To  unambiguously meet the requirements of the statute governing the use of statements of an accused, the statement should contain language, near or adjacent to the signature of the person giving the statement, that the person knowingly, voluntarily, and intelligently waived the rights described in the statement before and during the making of the statement. Article 38.22 § 2(a, b). *Garcia v. State*, 919 S.W. 2nd 370 (Tx.Cr.App. 1994).

This Court held in *Oliver v. State*, 29 S.W. 3rd 190 (Tex.App. –San Antonio, 2000) that the "Court of Criminal Appeals has approved the inference of a waiver from the totality of the circumstances in the situation where an oral confession contains a recitation of the article 38.22 warnings and the defendant indicates he understands his rights and proceeds without hesitation to participate in the interview." *Oliver*, 29 S.W. 3rd 193.  Cruz was not provided with the full 38.22 warnings necessary to infer a waiver by proceeding with the interview, especially in light of the fact that he was not in possession of his full mental faculties. While both articles 38.22 and 38.23 govern when certain evidence shall and shall not be admitted at trial, they do so in very different terms. Article 38.23 mandates the exclusion of evidence when it has been obtained in contravention of legal or constitutional rights. As such, it is properly identified as substantive in nature, as it is an attempt to provide

---

10This was in reference to a previous shooting attempt on the complainant.

9

a remedy for a violation of those rights. See, e.g., *Jackson v. State*, 968 S.W. 2nd 495, 499

(Tex.App.--Texarkana 1998, *pet. ref'd*)(laws that invoke the article 38.23 exclusionary rule

are those that protect rights and interests of citizens from infringement by the State); see also

*Johnson v. State*, 864 S.W. 2nd  708, 724 (Tex.App.--Dallas 1993)(with article 38.23, the

legislature provided a legal remedy for a suspect whose statutory or constitutional rights had

been violated, *aff'd*, 912 S.W. 2nd 227 (Tx.Cr.App.1995)); *Imo v. State*, 826 S.W. 2nd 714, 715

(Tex.App.-- Texarkana 1992, *no pet.*)(article 38.23 is more protective of individual rights

than the federal constitution.)

Article 38.23 provides, in part:

(a) No evidence obtained by an officer or other person in violation of any provisions of the
Constitution or laws of the State of Texas, or of the Constitution or laws of the United States
of America, shall be admitted in evidence against the accused on the trial of any criminal case.

By contrast, article 38.22 prescribes the various requirements that must be satisfied

before a statement made by an accused as a result of custodial interrogation will be admitted

against him at trial. That such requirements are not met does not mean that the statement was

necessarily obtained as a result of any legal or constitutional violation, and article 38.22

mandates exclusion of such statements by its own terms and without reference to article

38.23.  Article 38.22 is more appropriately characterized as a procedural evidentiary rule.

*Davidson v. State*, 25 S.W. 3rd 183, 186 (Tx.Cr.App. en banc 2000); see *Xu v. State*,  191

S.W. 3rd 210 (Tex.App. --San Antonio, 2006).

*Custodial Interrogation*

The Appellant's statement was custodial and he was provided the warnings from the SAPD 66E rights card.  However, the rights card does not contain the complete statutorily required language. The Appellant never subsequently provided a written statement. The full statutory warnings are contained at the top of the written statement forms.  Because he never provided a written statement, the Appellant was never provided the full statutory warnings. If a statement is deemed to be custodial, and Miranda is not substantially complied with, then the statement is deemed to be involuntary and should not be admitted.

The *Garcia* case was used, in the days before the recorded video statement, to thwart an appellant's argument that he did not receive the appropriate warnings.  However, under the specific facts of this case, the Appellant relies on *Garcia* for the proposition that "an appellant's acknowledgment that he understood his rights does not indicate a waiver of those rights." 919 S.W. 2nd 379.  In the normal circumstance, after receiving the oral warnings, a suspect would sign his statement which contained the full warnings.  This did not happen here.  The circumstance of signing the statement with the warnings, after having read them, was the whole basis of *Garcia,* and is not applicable here.  By that very fact, *Garcia* serves to support the Appellant's argument that the statement was involuntary.

*High on Methamphetamine*

In determining the voluntariness of a confession, a reviewing court will also consider whether the police have knowledge of any special weakness of the suspect. *Gallegos*, 370

11

U.S. at 53-55, 82 S.Ct. at 1212-13; *Gomes*, 9 S.W. 3rd 377.  Indeed, a suspect's ability to resist pressure is very relevant to whether his or her confession is voluntary. See *Ashcraft v. Tennessee*, 322 U.S. 143, 64 S.Ct. 921, 88 L.Ed. 1192 (1944) (fatigue); *Haynes v. Washington*, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed. 2nd 513 (1963) (lack of experience with police); *Greenwald v. Wisconsin*, 390 U.S. 519, 88 S.Ct. 1152, 20 L.Ed. 2nd 77 (1968) (physical illness); *Blackburn v. Alabama*, 361 U.S. 199, 80 S.Ct. 274, 4 L.Ed. 2nd 242 (1960) (mental illness); *Culombe v. Connecticut*, 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed. 2nd 1037 (1961) (mental retardation); *Davis v. North Carolina*, 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed. 2nd 895 (1966)(race); *Jones v. State*, 944 S.W. 2nd 642, 651 (Tx.Cr.App.1996) (intoxication). In the instant case, Detective Bradley agreed that Cruz was high at the time of the making of his statement.  The cold record of his testimony might indicate that he believed Cruz was "coherent." (R.R. v. 4, p. 50) It does not take very long to come to the conclusion that Cruz was exceptionally intoxicated on the DVD.  Although he initially informed Bradley that he had not taken meth for the last three to four days, what he meant to say was that he had been awake for the last three to four days and had taken meth earlier in the day.  (SX 160A - 12:44:49)

Referencing his discussions with Batterton, Detective Bradley spoke in general terms that people who are high on meth cannot maintain logical transition of thought.  Meth makes it hard for "them to think in a straight line." "They are all over the place." (R.R. v. 4, p. 34) It is the usual result that this Court will not reverse based on this argument, almost always

inferring waiver, without more.  However, in the case at bar, considering the mental impairment that is obvious from a review of the DVD, it is clear that there are additional circumstances present that necessitate a finding that waiver cannot be inferred.

## POINT OF ERROR NUMBER TWO

The trial court abused its discretion when it allowed the jury to hear the Appellant referencing discussions with his attorneys, in violation of the 6th and 14th Amendments to the United States Constitution and Article 1 Section 10 of the Texas Constitution.

### Specific Facts

A review of SX 160A indicates that Detective Bradley commenced a conversation with Cruz about the murder of Baxter.  Cruz then told Bradley that he had spoken with Jack McGinnis. According to the DVD, Mr. McGinnis informed Cruz that he would find out what was going on with the new charges.  (12:49:06) Cruz goes on to discuss that he was supposed to go and see his attorney Shawn Brown, that day.  He wanted Shawn to find out what was going on before Cruz decided to make any decisions.  (12:49:15) This was obviously a conversation between Cruz and Bradley referencing discussions Cruz had about this murder with his attorneys.   Shawn Brown was his trial attorney. Toward the end of the DVD provided, Cruz again references his attorney, however, it is clear that it was part of something that was supposed to have been redacted, but not was fully done so. (12:58:40) Therefore, it is painfully obvious that all discussions should have ceased because Cruz was represented by counsel and even if Shawn Brown and Jack McGinnis had not yet filed notice of appearance because Cruz had only just been arrested, he was clearly indicating to Bradley

that he was represented and wanted to speak with them about what to do.  And again, considering the mental impairment of Cruz, where he might not have been able to adequately elucidate his thoughts  as well as a non-impaired person might, Detective Bradley should have scrupulously honored the fact that Cruz was informing him of conversations he had and wanted to have with his attorneys referencing this case.

At the motion to suppress, the argument for admission, as it applied to this particular issue was that Cruz was referencing his attorneys on unrelated matters.  (R.R. v. 4, p. 56)  A review of the DVD indicates that this is not the case.  McGinnis and Brown were already representing Cruz on something unrelated, but his discussions referenced his conversations with McGinnis and desired conversation with Brown directly related to the murder charge.

## ARGUMENTS AND AUTHORITIES

*Inference of Guilt*

A recorded verbal assertion of these rights raises an inference of guilt, and cannot be disclosed to the jury. *Sontag v. State*, 841 S.W. 2nd 889, 893 (Tex.App. –Corpus Christi, 1992).  As the Supreme Court explained, "[I]t is impermissible to penalize an individual for exercising his Fifth Amendment privilege when he is under police custodial interrogation. The prosecution may not, therefore, use at trial the fact that he stood mute or claimed his privilege in the face of accusation." *Miranda*, 384 U.S. 468 n. 37, 86 S. Ct. 1602.  Evidence of invoking the right to terminate an interview is inadmissible as evidence of guilt. See *Hardie v. State*, 807 S.W. 2nd 319, 322 (Tx.Cr.App.1991). The *Cooper* Court opined that

although *Hardie* referred specifically to invocation of the right to counsel, there was no reason to differentiate an invocation of the right to terminate. *Cooper*, 961 S.W. 2nd 227; *Watson*, 762 S.W. 2nd 591. In the case at bar, Cruz not only mentioned that he wanted to speak to Shawn Brown about this case, the DVD statement clearly indicates that Cruz believed he was currently represented by Shawn Brown and Jack McGinnis. No further questioning should have occurred.

## POINT OF ERROR NUMBER THREE

The trial court abused its discretion in denying the Appellant's motion for an instructed verdict because the evidence was insufficient to support conviction of the offense as charged.

### Specific Facts

After the State rested, the defense urged a motion for directed verdict arguing that the accomplice witness testimony was not sufficiently corroborated. Further, the defense argued that Cruz could not have anticipated that a murder would have occurred two to three hours after he left. The trial court overruled the motion. (R.R. v. 7, p. 170)

*Vansyckle - As an Accomplice Witness*

Clifford Vansyckle testified with his attorney present. (R.R. v. 5, p. 89) He had been allowed to plead to attempted aggravated assault and apply for probation. (SX 154 - plea bargain) Vansyckle testified that he was present at the house at the beginning of the incident and toward the end, but was not there at the very end. Baxter was still alive when he left the house with Cruz and Hettler for the last time that day. (R.R. v. 5, p. 90) Vansyckle testified that he did not participate in the beating of Baxter, although he was the acknowledged

15

enforcer who usually did the "disciplining." John Boyer and Brian Cyr will later testify that Vansyckle actively participated in the assault on Baxter. Vansyckle's plea bargain was presumably based on his own statement, i.e., that he did not touch Baxter, all other evidence being to the contrary. The defense questioned Vansyckle about his testimony at Cyr's trial. At Cruz's trial, he testified that Cruz told him he had kicked Baxter. At Cyr's trial, he did not say that Cruz ever told him he had been kicking Baxter. He also did not testify that he ever saw Cruz kicking Baxter. Vansyckle's explanation was that he was not asked, which seems unlikely as the State's theory of the case, that being one of accomplice witness and the law of parties, was applicable at Cyr's trial as well. (R.R. v. 5, p. 145) This took place outside the presence of the jury.

Vansyckle insisted he did not touch Baxter. (R.R. v. 4, p. 170) Without that, he would not have been able to secure his attempted aggravated assault plea bargain. (R.R. v. 5, p. 173) However, Vansyckle let it slip at page 174 that "I wasn't the first person to hit him." This, of course, makes clear that he did hit Baxter at some point, but that he did not start the beating. The defense did not catch this and the State made no attempt to clear up this dichotomy in his testimony. Vansyckle testified that he and Guadalupe Villarreal got the whole thing started, while Cruz was simply sitting on the couch. (R.R. v. 5, p. 175)

*Batterton as an Accomplice Witness*

On re-cross examination, Detective Bradley actually thought it was credible that Batterton was not concerned with being charged with murder, even though he would not

cooperate until Bradley provided him the defense of duress and inquired about immunity. Clearly, a murder charge was more of a concern to Batterton that any fear of retribution, although it was Brian Cyr and Lupe Villarreal who were always beating up on Batterton. He did not mention fear of Cruz at all. (R.R. v. 4, p. 87) Bradley testified about his interview with Batterton. (R.R. v. 4, p. 64) Batterton was in jail on drug charges. Bradley had spoken with Assistant District Attorney Scott Simpson prior to the interview. Bradley acknowledged he could have gotten a warrant for murder against Batterton. However, he discussed immunity with Simpson because Batterton had mentioned it. (R.R. v. 4, p. 58) Batterton was already looking at time in prison, but not much. When Batterton would not admit to the actual shooting of the complainant, Bradley informed Batterton that if someone kills someone because there is a gun at their head, then this is not murder. Further, Bradley told Batterton that he could help him out with his four-year prison sentence on pre-existing charges as well. (R.R. v. 4, p. 71) In addition, it was Bradley who provided Batterton with the language "I was in fear for my life." [11] Batterton was supposedly not allowed to leave until the following day. The following day was the day he killed Baxter. There was no one guarding the door. Batterton could easily have left, however, he did not. Duress causing him to kill Baxter seems unlikely. Although Michael Yaws was an active participant throughout the entire beating of Baxter, Jonathan Boyer testified that he was guarding the front and back

_____

[11] The defense wanted Batterton's DVD statement in evidence as it indicated the defense of duress was fed to him. The trial court did not allow it. The defense requested the to make a bill, however, the exhibit volume does not contain a copy of Batterton's DVD for review on appeal.

doors of the home with a .45 so that Batterton would not have been allowed to leave. This was clearly not true. Even Batterton admitted he could have left because there was no one guarding him at the house during the incident in question. (R.R. v. 6, p. 30) Jonathon Boyer testified that he told Batterton to go out to the garage, however he admitted Cyr did not tell him to get Batterton. Batterton testified that Lupe Villarreal had told Batterton NOT to go out to the garage, but that he did anyway. (R.R. v. 6, p. 98) Batterton testified that Cyr never ordered Boyer to get him from the house to go into the garage. Regarding the previous night when he was allegedly being held for the $5000.00 ransom at the Motel 6, Batterton admitted that he could have escaped because with so many other people around, and with all the drugs in the room, no one would have run after him. (R.R. v. 6, p. 90) As far as his excuse that he was fearful for his family, a similar "holding for ransom" had occurred recently to someone by the name of Party Joe. He was being held in the bed of a truck. He jumped out and escaped. Nothing ever happened to his family, according to Batterton. (R.R. v. 6, pgs. 92, 96) Batterton testified that it was Villarreal who summoned him to go into the garage. When Batterton entered the garage, Cyr had a weapon in his lap BUT he never ordered Batterton to kill Baxter. Cyr testified later that Batterton picked up the other gun and voluntarily shot Baxter. At no point in time, while Batterton had a gun in his hand and no one else did, did he try to use that force to prevent this alleged duress being applied against him. Considering the use of force against Batterton the previous day, it makes much more sense, especially in light of the contradictory testimony concerning any alleged duress, that

Batterton voluntarily killed Baxter in an attempt to regain whatever scintilla of respectability he could within this group. He said that Baxter did not look alive. At Cyr's trial, Batterton testified that at this point, Baxter was still alive. (R.R. v. 6, p. 104) Yaws was rolling the tarp. Brian Cyr informed Batterton that he was going to be a part of this, with no more specificity being provided by Batterton.[12] (R.R. v. 6, p. 58) Batterton said that Yaws cocked the gun and put a bullet in the chamber, all of which will be later contradicted by Cyr, whose testimony was not filled with contradictions and motivations to lie. (R.R. v. 6, p. 59) Batterton testified that he pulled the trigger. Batterton also testified that he never saw Cruz with a weapon on that night. At Cyr's trial, Batterton testified that he did help load Baxter's body into Cyr's van. However, at this trial he insisted he had nothing to with that activity. (R.R. v. 6, p. 109)

Batterton testified he feared for his life, but there was no one preventing him from leaving and no one ordering him to kill Baxter. (R.R. v. 6, p. 60) The defense of "duress" allowing him immunity was not a valid one. Batterton told the jury that Cruz was not there when he shot Baxter. After he pulled the trigger, Yaws and Cyr drove the body away. (R.R. v. 6, p. 62) On cross-examination, Batterton testified that he had told Detective Bradley that he had been awake for 20 days at the time of the incident. He also testified that Cruz was not present during his beating. (R.R. v. 6, p. 79) However, in a previous trial, Batterton testified that Cruz did participate in his beating. Batterton then admitted that he lied in Cyr's jury

---

[12]Cyr's testimony indicated that Batterton was to help in the cover-up and clean-up process. (R.R. v. 6, p. 211)

trial. (R.R. v. 6, p. 81)  Further, Jonathon Boyer had testified earlier that he offered to take a bullet for Batterton during his beating.  Batterton does not remember Boyer ever doing that and Cyr later testified that it did not happen.  Further, Batterton testified that Boyer participated in the assault upon him contradicting Boyer's testimony that he did not.  (R.R. v. 6, p. 87) It would appear that with all the plea bargains and grants of immunities, the only person who actually had a motivation to testify truthfully was Brian Cyr.  Closing down Batterton's testimony, he admitted that Detective Bradley gave him the "duress" defense about a gun being at his partner's head meaning that was not murder.  And Batterton testified that it was Bradley who first used the words "in fear for your life." (R.R. v. 6, p. 124) He admitted to lying to Bradley about not shooting Baxter until Bradley came up with the duress excuse.  (R.R. v. 6, p. 106) Batterton reiterated that Cyr never had a gun to his head or even threatened him with the gun or ordered him to kill Baxter.  (R.R. v. 6, p. 107)  Batterton also testified at Cyr's trial that this was not that big a deal, i.e., having killed Baxter.  Perhaps the State did not like that attitude being portrayed to the jury, but he sure changed his tune at this trial.  Further, on page 101 of this volume, Batterton testified that he did not remember ever seeing Michelle, Yaws, girlfriend, who was an active participant in the aftermath cleanup and potentially helped tie up Baxter. However, only a few pages later, on page 107, Batterton testified that he had seen Michelle and Yaws with the gun that he used to kill Baxter. Batterton also testified that he never saw Cruz with a weapon on that night.  Batterton is a liar that even managed to manipulate the State into a full grant of immunity, which should

have been pulled after this barage of lies. (R.R. v. 6, p. 108) Batterton actually testified that eluding prison was not his motivation for testifying because probation can be really "rough" too. (R.R. v. 6, p. 122)

*Jonathon Boyer - never charged - testimony that he participated in the assault of Baxter*

Boyer's initial testimony discussed the initial kidnapping and beating of Dane Batterton. (R.R. v. 6, p. 6) Allegedly, Dane had stolen a laptop from an old woman they called the Red Dragon. She asked Brian Cyr to discipline Dane. (R.R. v. 6, p. 7) They went looking for Dane and eventually took him over to Chelmsford. (R.R. v. 6, p. 8) They told him to return the laptop. Yaws, Villarreal, Brian Cyr, Jason Borg and someone they called JC were there and they beat up Batterton very badly. (R.R. v. 6, p. 9) As with Sprouse and Baxter, Batterton was hog tied and threatened with death. Obviously, this did not occur.

Discussing the Baxter incident, Boyer testified he saw Cruz hit Baxter in the head with a bat. However, this one hit was not the cause of death. (R.R. v. 6, p. 15) Although Boyer said this surprised him, based on the testimony of the other beatings, being hit with a baseball bat in the head was a frequent occurrence. Boyer went back into the house and went upstairs where he proceeded to do meth for the next several hours. (R.R. v. 6, p. 18) When he came back down to the garage, Cyr, Hettler, Villarreal, Berban, Yaws, JC and Michelle were there. Jason Borg was in and out of the garage. Baxter had been moved to a tarp near the garage door, presumably because of the blood. People were kicking and mocking Baxter. Boyer saw a brick near Baxter's head. Boyer says he told Batterton to go into the garage, but both

Batterton and Cyr contradict that version of events. Further, it seems uncontroverted that several hours before the shooting of Baxter, Vansyckle, Cruz, and Hettler had left. (R.R. v. 6, p. 20) Boyer did testify that Cyr did not order Batterton into the garage. At this point, Baxter was still alive. Boyer testified that he went upstairs and two hours later, he heard two "firecracker" sounds. (R.R. v. 6, p. 34) Around noon the next day, Boyer went back to the garage and discovered it had been bleached. (R.R. v. 6, p. 22) After this, Boyer testified he disappeared from the scene. Boyer was never charged with anything and never provided a written statement. (R.R. v. 6, p. 22) It seems obvious that Boyer was actively involved in the initial kidnapping of Batterton the day before Baxter's death. Further, Boyer admitted that he actively participated in the assault on Batterton. (R.R. v. 6, p. 26) Cruz was not involved in the Batterton assault, however. Although Boyer claims to have attempted to help Batterton, he did nothing to help Baxter. (R.R. v. 6, p. 29) Boyer further testified that he had been told that Vansyckle participated in the beating of Baxter. He did see Vansyckle putting boots on and Yaws had informed him he had loaned his boots to Vansyckle. This would seem to completely contradict Vansyckle's testimony that he did not participate in the Baxter assault, which enabled him to obtain his plea bargain of attempted aggravated assault. (R.R. v. 6, p. 31) Boyer believed Vansyckle participated in the assault on Baxter just as Cyr testified Boyer and Vansyckle both participated in the assault on Baxter.

*Brian Cyr - Accomplice Witness as a Matter of Law*

At this point, there were extensive discussions about Cyr's potential testimony, but

the long and short of it was that Cyr decided to waive his 5th Amendment rights to testify

knowing that it would destroy any chance he might have on appeal.  Cyr testified that he was

waiving his rights because Cruz was innocent of the murder.  (R.R. v. 6, p. 177) As opposed

to the rest of the State's witnesses, who either received great benefits in exchange for their

testimony or whose testimony lacked any credibility, with both Vansyckle and Boyer

testifying they had nothing to do with the Baxter assault,  Cyr received no benefit.  (R.R. v.

6, p. 182) Cruz had nothing to do with the Batterton beating.  That seemed well established.

Cyr  testified that John Boyer never offered his life for Batterton's.  And, honestly, it does

not make sense to believe that someone who could sit by and do nothing, and participate in

the beating of Baxter, even if not responsible for his murder, would have the great moral

center to offer his life in exchange for Batterton's.  (R.R. v. 6, p. 185)   Cyr testified that

Boyer did nothing to stop the Batterton assault, although he did help him after the fact.

Further, Cyr never held a gun to Batterton's head nor did he order him to shoot Baxter.

Batterton testified to this as well.  All we have to go on for proof of the duress was that

Batterton allegedly feared for his life, all evidence to the contrary.  He was left alone for

hours in the house with no one guarding him.  He never tried to escape.  He had seen Party

Joe escape and nothing happened to his family.  We also know from Batterton that it was

Detective Bradley who fed him the line that he was in fear for his life.  All evidence, from

all witnesses, would indicate that Batterton was under no duress on that evening.  Cyr

testified that all knew, including Baxter, that he was there to be disciplined.  They just

accepted it.  Only Cyr knew that he had murder planned.  He never shared this with anyone.
(R.R. v. 6, p. 195)  Cyr testified that he knew at the Motel 6 he was going to kill Baxter.
(R.R. v. 6, p. 196)  "I am the reason he was murdered." (R.R. v. 6, p. 199)  Cyr testified
that upon his arrival at Chelmsford, Villarreal and Vansyckle were beating up Baxter.
Vansyckle hit Baxter four or five times and kicked him two or three times.  This certainly
seems more reliable as Vansyckle was the "enforcer" and admittedly went there with the
intent to discipline Baxter. (R.R. v. 6, p. 200) Cyr then explained the "it's between you and
me" issue that was debated at great length when the State was playing the video clips and
attempting to get Vansyckle to authenticate the voices on the clips.  The State tried to imply
that it was a statement made by Baxter to Cruz.  Cyr explains that it was a statement between
Baxter and himself.  Given that Vansyckle had great difficulty in authenticating the voices
on the video clips, this was much more reliable.   Cyr also saw people, specifically Michael
Yaws, taking practice swings in the air. (R.R. v. 6, p. 202) Cyr testified that upon Hettler and
Vansyckle's return from McDonald's, they resumed hitting Baxter.  Cyr testified that Cruz
hit and kicked Baxter, but implied that his participation was more brief than others. (R.R. v.
6, p. 204)  Cruz left at 3:00 in the morning and Baxter was shot around sunrise. (R.R. v. 6,
p. 205)  The video clips end around 2:45 a.m.  This was because Hettler left with Cruz and
Vansyckle and it was his phone that was being used to video the event. It goes without saying
that in the several hours in the interim, the beatings continued potentially driving Baxter to
the point of near death when Batterton shot him.  There was no testimony on that regard, but

we know that several hours passed from Cruz's departure, where Baxter still had the ability to scream, to the time of the shooting.

Cyr testified that when Cruz left, he gave him a hug and picked his pocket, taking his gun. Cruz did not know Cyr got his gun nor did he know that it was used to kill Baxter. Lupe Villarreal, Michael Yaws, Jonathon Boyer and Dane Batterton remained in the garage after Cruz, Vansyckle and Hettler departed. Several hours passed before Baxter was shot. All Cyr said to the group was that it was time for Baxter to get shot. It was the first time he had said that all evening. (R.R. v. 6, p. 207) Cyr testified that Batterton walked over to the table, got the gun and shot Baxter. Baxter was still alive when he was shot. (R.R. v. 6, p. 208) Cyr said that Batterton helped load the body, which Batterton said at Cyr's trial, although he denied it at this trial. At the time of the loading of the body, the sun was coming up. Cyr said he drove around for about an hour. Batterton said they were back in 10 minutes, which seems unrealistic. (R.R. v. 6, p. 211) Cyr never told Cruz that he used his weapon for the murder. (R.R. v. 6, p. 212) Cyr further testified that he learned at his own trial that Hettler had said Vansyckle had deleted some of the videos.

Cyr testified that when he was initially at the jail, he had Cruz beat up because he heard that Cruz was calling Cyr a snitch. (R.R. v. 6, p. 214) On cross-examination by the State, Cyr testified that, prior to his own trial, he wrote an affidavit for Cruz. The result of his trial was not a factor. He had already decided to help Cruz when the time came. (R.R. v. 6, p. 221) The State presented letters Cyr wrote. (SX 165-168) The defense objected

because this was improper impeachment.  Cyr had not denied making any of the statements contained in the letters and had offered explanations for them.  The trial court sustained the defense objection.  Two years earlier, Cyr felt that, but for Cruz and Terry Adams, he would not have gotten so mad at Baxter that he decided he needed to die.  He was referencing the alleged hit story that Baxter had told Adams earlier in the day, i.e., that Hettler had put a hit out on Cruz.  (R.R. v. 5, p. 97) Adams had his own intentions for that night, but they mostly dealt with the laptop issues. Cyr had his own ideas about murder.  Cyr testified that he wrote these letters because he thought Cruz had been the snitch and so he put a green light on him.  Cyr admitted to having had problems with Cruz, which would indicate that his willingness to testify on his behalf was genuine. The State could point to no erroneous motivation for his testimony.  (R.R. v. 6, p. 225)

Attempting to impeach Cyr, the State put forth a phone call between Cyr and Shyla, Cruz's child's mother. The jury was removed from the courtroom so the court could rule on SX 169.  The defense argued that there had been no prior inconsistent statement and there was also an improper predicate for any hearsay of Shyla Underwood under rule 613.   The objection was overruled.  SX 170 was a letter from Cyr to Hettler which discussed rumors that were circulating around the jail.  As far as Shyla's phone call, Cyr was trying to explain to her why he was going to testify for Cruz.  She did not want him to waive his rights and testify.  The phone call consisted of Cyr telling Shyla that he believed all of the State's witnesses to be liars, which after reading this record, is a reasonable conclusion.  Cyr is the

26

only person with anything to lose by testifying.  (R.R. v. 6, p. 230)

The only evidence that the State had against Cruz was for aggravated assault with a deadly weapon.  The cell phone video clips did not provide much useful evidence, except to place people in the garage participating in the assault on Baxter, something that seemed relatively uncontroverted.  The only evidence that Cruz participated in the assault came from Vansyckle and Boyer.  Cyr, who had nothing to gain by testifying, told the jury that both Vansyckle and Boyer also participated in the assault on Baxter.  The evidence against Cruz was no stronger than the evidence against Vansyckle and Boyer.  If Cruz could be charged with murder, then so could they have been.  However, the State needed live witness testimony because the video clips were clearly not sufficient to base a conviction upon.  As Detective Bradley testified, he could have charged Batterton with murder, but for some unknown reason, they decided to provide him with immunity.  We know that Cruz left hours before the murder occurred, when Baxter was very much alive.  Whatever happened to Baxter in the interim cannot be attributed to Cruz, as it cannot be attributed to Hettler, who got 35 years, or to Vansyckle, who was allowed to plead down to a 3rd degree felony.  Based upon the two to three-hour lapse between Cruz's departure and Baxter's murder, where Cyr, Yaws, Villarreal, Boyer and Batterton remained with Baxter, the testimony of the Medical Examiner, discussed infra at pages 28, 29, 45, as to Baxter's condition immediately prior to the shooting, was insufficient to place the blame on Cruz for the murder, either as a primary or as a party.  Therefore, the evidence was insufficient because the accomplice witness

testimony was never sufficiently corroborated.  Further, Cruz's conviction cannot be upheld under the law of parties.  Never before had any of the "disciplinings" resulted in a death. Sprouse had been "disciplined on the 2nd of March and although he was hot tied, beaten and had a rag stuffed in his mouth, he was not killed.  Batterton had been beaten in the same manner the previous day.  He was not killed.  Even Vansyckle testified that he had been hit twice before in the head before with a bat. (R.R. v. 5, p. 189) He was not killed.  Baxter was very much alive when Cruz left.  He was able to scream and yell, as both Sprouse and Batterton testified to that they did as well during their respective beatings.  There was no evidence to rely upon that Cruz could have anticipated that a murder would have resulted. Whatever Cyr, Yaws, Villarreal, Boyer and Batterton did to Baxter after Cruz, Hettler and Vansyckle left, Cruz cannot be held criminally liable for.

*Dr. Elizabeth Peacock - Medical Examiner*

The final witness was the Medical Examiner, Dr. Elizabeth Peacock. (R.R. v. 6, p. 127; SX 158 - Autopsy) Peacock testified that the injuries indicated that Baxter was hit four times with a cylinder.  The evidence did not indicate that Cruz hit Baxter four times with a bat. Only Boyer testified that he allegedly saw Cruz hit Baxter one time with a bat. According to Peacock, the bat did not necessarily cause the head injury.  (R.R. v. 6, p. 159)

Peacock would not say one way or the other as to whether the heart was beating when Baxter was shot, i.e., it could have been beating.  At this trial, Peacock testified that there was slight bleeding and hemorrhaging at the wound sight.  This could mean that Baxter was

28

still alive or it could mean that there was blood in the tissues so "it cannot be distinguished." (R.R. v. 6, p. 160) All credible evidence seemed to indicate, that at the very least, Baxter was very much alive when Cruz left around 3:00 a.m. Baxter was not shot for several more hours, around sunrise. We have no idea what transpired during the interim when Cyr, Yaws, Villarreal, Boyer and Batterton were still dealing with Baxter. So Peacock's opinion as to Baxter's condition at the time of the shooting becomes irrelevant as applicable to any knowledge on Cruz's part. It did not prove that Cruz could have or should have anticipated that when he left Chelmsford, the remaining actors would kill Baxter. We know that Baxter was actively screaming when Cruz left the house, so he was clearly alive. Further, Batterton testified, at least at Cyr's trial, which was closer in time to the event, that Baxter was alive when he shot him.

Peacock testified that Baxter had very low or little blood pressure when he was shot. However, when testifying at Cyr's trial, p. 88, lines 10-13 of that transcript, she testified that Baxter had very low blood pressure. She did not testify that he had little to no blood pressure. (R.R. v. 6, p. 161) Peacock had to admit that there was a possibility that Baxter was not dead. Next came the dichotomy between Peacock's testimony at this trial and at Cyr's trial concerning whether, but for the gunshot wound, Baxter would not have died. The State can attempt to put whatever spin on it they want, but at Cyr's trial, Peacock testified that if she had seen him, Baxter would not have died. (See DX 6 - Cyr trial transcript of her testimony) The State tried to imply that what Peacock actually meant was that she only

deals with dead people, so she would not have seen him, other than for him being dead. Peacock knew what the attorneys were asking, i.e., if medical attention had been sought prior to the gunshot, would Baxter have lived.  (R.R. v. 6, p. 164) The State continually attempted to explain this away accusing the doctor of being flippant.  The State went further to imply that because this doctor is not an ER doctor,  she would not have been able to save Baxter or that her opinion in this area  is less than reliable because that is not her specified field.  The defense asked one final question - whether Dr. Peacock was a medical doctor, to which, of course, the answer was "Yes." (R.R. v. 6, p. 165)   All of this remains irrelevant because Cruz cannot be held accountable for a murder that occurred hours after he left, that he could not have anticipated.

## ARGUMENTS AND AUTHORITIES

A denial of a motion for directed verdict is treated as a challenge to the legal sufficiency of the evidence to support the conviction. *Williams v. State*, 937 S.W. 2nd 479, 482 (Tx.Cr.App.1996); see *McDuff v. State*, 939 S.W. 2nd 607, 613 (Tx.Cr.App.1997), cert. denied, 522 U.S. 844, 118 S.Ct. 125,139 L.Ed. 2nd 75 (1997). A legal-sufficiency challenge requires the reviewing court to determine whether, after viewing the evidence in the light most favorable to the verdict, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Johnson v. State*, 23 S.W. 3rd 1, 7 (Tx.Cr.App.2000).  They do not resolve any conflict of fact, weigh any evidence, or evaluate the credibility of any witnesses, as this was the function of the trier of fact. See *Dewberry v.*

*State*, 4 S.W. 3rd 735, 740 (Tx.Cr.App.1999). Instead, the reviewing court determines whether both the explicit and implicit findings of the trier of fact are rational by viewing all the evidence admitted at trial in the light most favorable to the verdict. *Adelman v. State*, 828 S.W. 2nd 418, 422 (Tx.Cr.App.1992). In so doing, any inconsistencies in the evidence are resolved in favor of the verdict. *Matson v. State*, 819 S.W. 2nd 839, 843 (Tx.Cr.App.1991).

The standard for reviewing the legal sufficiency of the evidence is whether, viewing the evidence in the light most favorable to the jury's verdict, any rational trier of fact could have found beyond a reasonable doubt the essential elements of the offense charged. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed. 2nd 560 (1979); *Villalon v. State*, 791 S.W. 2nd 130, 132 (Tx.Cr.App.1990); *Skillern v. State*, 890 S.W. 2nd 849, 879 (Tex.App.--Austin 1994, pet. ref'd). The standard of review is the same in both direct and circumstantial evidence cases. *Herndon v. State*, 787 S.W. 2nd 408, 409 (Tx.Cr.App.1990). In a review of the legal sufficiency of the evidence, the reviewing court must consider all the evidence that the jury was permitted, properly or improperly, to consider. *Johnson v. State*, 871 S.W. 2nd 183, 186 (Tx.Cr.App.1993), cert. denied, 511 U.S. 1046, 114 S.Ct. 1579, 128 L.Ed.2d 222 (1994). Moreover, the sufficiency of the evidence should be measured by the elements of the offense as defined by the "hypothetically correct jury charge for the case." *Malik v. State*, 953 S.W. 2nd 234, 240 (Tx.Cr.App.1997).

The Appellant, however, asserts that the evidence never measured up to the requirement of Article 38.14 which provides:

A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense. Tex.Code Crim. Proc. Ann. art. 38.14 (Vernon 1979).

It is clear from the statute that the testimony of an accomplice witness alone cannot furnish the basis for a conviction and a conviction so based must be reversed. *Paulus v. State*, 633 S.W. 2nd 827, 843 (Tx.Cr.App.1981). And this is true no matter how complete a case against the defendant may have been made by the accomplice witness's testimony, and no matter how much credit the jury might have given to such testimony. *Id.*; *Walker v. State*, 615 S.W. 2nd 728, 731 (Tx.Cr.App.1981). An accomplice witness has been described as a discredited witness. See *Munoz v. State*, 853 S.W. 2nd 558, 559 (Tx.Cr.App.1993). It has been said that the testimony of an accomplice witness must be viewed with caution and carefully scrutinized not only because of any interest such witness might have, but because his or her testimony is evidence from a corrupt source. *Paulus*, 633 S.W. 2nd 843; See also *Fernandez v. State*, 989 S.W. 2nd 781 (Tex.App. –San Antonio, 1998)

Some accomplice witnesses are deemed so as a matter of law. *DeBlanc v. State*, 799 S.W. 2nd 701, 708 (Tx.Cr.App.1990). Others are accomplices are as a matter of fact. *Id.* A co-conspirator is an accomplice. *Chapman v. State*, 470 S.W. 2nd 656, 660 (Tx.Cr.App.1971). In determining whether a person is an accomplice, the test is not whether the witness is actually charged and prosecuted for his participation. *Blake v. State*, 971 S.W. 2nd 451, 454-55 (Tx.Cr.App.1998). Rather, the record should be examined for evidence that would support a charge against the witness alleged to be an accomplice. *Id.* Accomplice-witness testimony

is "inherently suspect." *Jones v. State,* 982 S.W. 2nd 386, 389 n. 5 (Tx.Cr.App.1998). Therefore, the "accomplice-witness rule" provides that a conviction cannot stand on accomplice testimony unless there is other evidence tending to connect the defendant to the offense. *Vasquez v. State,* 67 S.W. 3rd 229, 236 (Tx.Cr.App.2002).

An accomplice participates with a defendant before, during, or after the commission of a crime and acts with the **required culpable mental state**. *Paredes v. State,* 129 S.W. 3rd 530, 536 (Tx.Cr.App.2004); *Kutzner v. State,* 994 S.W. 2nd187 (Tx.Cr.App.1999) (citing *McFarland v. State,* 928 S.W. 2nd 482, 514 (Tx.Cr.App.1996), *cert. denied,* 519 U.S. 1119, 117 S.Ct. 966, 136 L.Ed. 2nd 851 (1997)). The participation must involve an affirmative act that promoted the commission of the offense with which the accused is charged. *Id.* An accomplice witness is one who is susceptible to prosecution for the offense with which the accused is charged or a lesser-included offense. *Id.; Blake,* 971 S.W. 2nd 454-55. In the case at bar, the only evidence that the accomplice witness testimony corroborated was that Cruz was guilty of Aggravated Assault with a Deadly Weapon. There was no evidence that the assault that had occurred while Cruz was present was sufficient to cause Baxter's death. Based on the testimony, Vansyckle and Hettler are guilty of that as well. The evidence against Cruz, Vansyckle and Boyer is substantially the same, coming from different witnesses, none of whom, except for Cyr, was any more reliable than anyone else. So if the State believed the evidence supported a murder charge against Cruz, so did the evidence support potential murder charges against Vansyckle and Boyer. Obviously Batterton should

have been charged with murder, but he was never in the garage so his testimony does not offer any corroboration at all of anything Cruz did. Certainly, Batterton did not establish that he was under any type of duress. The State relied on the law of parties to support their charge of murder arguing that because Cruz participated in the assault many hours earlier, he therefore should have anticipated that a murder would have resulted. The evidence simply does not support that and the accomplice witnesses do not corroborate that.

A conviction cannot stand if the corroborative evidence **does no more than point the finger of suspicion toward an accused.** 24 Tex.Jur. 2nd Evidence, Sec. 694, p. 326, note 18. While presence of the accused with an accomplice when coupled with other circumstances may be sufficient corroboration, such cases tend to include corroborating evidence that places the defendant with the accomplice both immediately before **and immediately after** the offense, together with **other suspicious circumstances.** (emphasis added) *Munoz*, 853 S.W. 2nd 564. Because Cruz had been gone for several hours, he had absolutely nothing to do with the disposing of the body nor the clean up of the garage.

The trial court erred in denying the Appellant's motion for a directed verdict because the State failed in proving what 7.02 of the penal code requires to obtain a conviction under the law of parties. Further, the State's accomplice witness testimony was not sufficiently corroborated. The State introduced the Appellant's extrajudicial statement. Such a statement, if it tends to connect the accused to the commission of the offense, may in a proper case, itself corroborate the accomplice witness's testimony. See *DeBlanc*, 799 S.W. 2nd 718. The

34

Appellant did not admit to having anything to do with the murder or knowing that the murder was going to occur.  The statement alone does not tend to connect the Appellant with the murder as a party.  Although an accomplice witness may state any number of facts that are corroborated by evidence of non-accomplice witnesses, of which there were none in this trial, still if the facts thus corroborated do not tend to connect the accused with the crime, in this case the actual murder, corroboration on that basis would not meet the requirements of article 38.14.  *Id.*  If there are non-accomplice witnesses and their evidence fails to connect the accused to the offense, the evidence is insufficient to support the conviction.  *Munoz*, 853 S.W. 2nd 560; See also *Fernandez*, 989 S.W. 2nd 781 citing *Edwards v. State*, 427 S.W. 2nd 629, 632 (Tx.Cr.App.1968), where that Court wrote:

The test as to the sufficiency of the corroboration is to eliminate from consideration the evidence of the accomplice witness and then to examine the other witnesses with the view to ascertain if there be inculpatory evidence, that is evidence of incriminating character which tends to connect the defendant with the commission of the offense.  If there is such evidence, the corroboration is sufficient;  otherwise it is not.

See also *Burks v. State*, 876 S.W. 2ND 877, 887 (Tx.Cr.App.1994), cert. denied, 513 U.S. 1114, 115 S.Ct. 909, 130 L.Ed. 2nd 791 (1995).  Although corroborative evidence need not establish the defendant's guilt of the charged offense nor directly link the accused to the offense, it is sufficient if it "tends" to connect the defendant to the offense.  *Cox v. State*, 830 S.W. 2nd 609, 611 (Tx.Cr.App.1992);  *Granger v. State*, 683 S.W. 2nd 387, 392 (Tx.Cr.App.1984), cert. denied, 472 U.S. 1012, 105 S.Ct. 2713, 86 L.Ed. 2nd 728 (1985).  However, in the case at bar there was no non-accomplice evidence that did anything more than connect Cruz to the other

people associated with the Chelmsford house.

"Admittedly, heinous crimes such as that before us merit aggressive investigation and prosecution. Yet, constitutional mandates exists to curb aggressive efforts that exceed lawful parameters..." *Arizona v. Roberson*, 486 U.S. 675, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988).

## POINT OF ERROR NUMBER FOUR

The trial court abused its discretion when it allowed evidence of an extraneous offense, i.e. a prior shooting attempt of the complainant, as well as weapon and narcotic evidence in the guilt innocence phase of the trial, as proof of motive and contextuality respectively, in violation of Rules 403 and 404(b) of the Texas Rules of Evidence, the 6th and 14th Amendments to the United States Constitution and Article 1, Section 10 of the Texas Constitution.

### Specific Facts

The State called Natalie Marxer, a friend of Eliza Meade, a.k.a. Mylie, who owned the home on Chelmsford. (R.R. v. 4, p. 93) She had known Cruz since January of 2006. The jury was removed for a proffer of evidence concerning an incident in February of 2007. (R.R. v. 4, p. 100) Marxer would sometimes pick up Cruz's girlfriend, Shyla, from his house. Marxer was dating Vansyckle at the time. Cruz had previously gone to Marxer's hotel room and told her about an incident. Cruz asked if Marxer could make a few phone calls to inquire as to whether a shooting he and Rudy Hettler had participated in was successful. The intended target was the complainant. (R.R. v. 4, p. 101) Cruz and Hettler believed they missed and did not want Baxter out there "wounded, scared, or telling on them." The shooting took place in a field off of Blanco Road. The alleged motive had to do with vengeance being taken on behalf of Cruz's brother, who had allegedly been beaten up recently. (R.R. v. 4, p.102) The

36

problem with this evidence was that the incident involving the beating of Cruz's brother was only days before the murder and the alleged prior shooting attempt of Baxter was weeks before the murder, so the beating of Cruz's brother could not have been the motivation for that alleged shooting. And logically, had it been Cruz's motivation to murder Baxter, why then did he leave so many hours before the deed was done?  Further, there was insufficient information provided by Marxer to make this extraneous offense admissible. (R.R. v. 4, p. 103) The trial court allowed it but said he was not ruling on specific questions and was not ruling on the entire contents of the proffer.  The judge said the evidence would be limited because certain parts were not admissible.  However, the trial court did not provide any more information as to what he thought was and was not admissible.  The defense did not request the trial court for more specificity in his ruling.

The defense inquired of Marxer and she testified that she did not know the specifics of who shot at Baxter.  She was not sure of the location of the shooting.  The Defense argued that this was too vague to allow them to adequately defend against it.  (R.R. v. 4, p. 105) The trial court allowed this prejudicial extraneous offense evidence to go before the jury on the basis of motive.  The jury returned and heard Marxer's testimony.  (R.R. v. 4, p. 106)

Officer Robert Breen was called to testify as to the events surrounding the arrests of Villarreal and Cyr.  (R.R. v. 4, p. 111)  The defense objected because the events of this arrest were not relevant to Cruz, as he was not with them at their arrest.  (R.R. v. 4, p. 112) Being at the HEB at Jackson-Keller and West Avenue for a possible kidnapping unrelated

to our case, Breen noticed a truck pull into the parking lot which then met up with another vehicle. (R.R. v. 4, p. 113) The police approached the vehicles believing they were involved in the kidnapping, which turned out not to be the case. However, Villarreal and Cyr were arrested, wherein weapons were located in the truck. Further, seven live rounds of .380 ammunition was located. (SX 139 - Bersa Firestar .38 automatic pistol; R.R. v. 4, p. 115) In addition, narcotics were located. The defense objected to this evidence as being completely unrelated to Cruz. Villarreal and Cyr were both arrested for the weapons charge and Cyr also had a felony warrant on a cocaine and weapons case. Breen later learned that both Villarreal and Cyr had murder warrants. (R.R. v.4, p. 116) A search warrant was then obtained. Clothing and cell phones were located in the truck. (R.R. v. 4, p. 118) Again, there was no evidence that Cruz had anything to do with any of the evidence located in this vehicle. As to the evidence located during the Cyr and Villareal arrest, the State offered it under the umbrella of contextuality. None of the State's forensic witnesses could connect any of this evidence to Cruz in a way that was relevant to the murder case. Considering the other evidence involved in this case, this type of evidence was exceptionally prejudicial. (R.R. v. 4, p. 124)

## ARGUMENTS AND AUTHORITIES

Reviewing courts should not carve out exceptions to rule 404(b) that would allow extraneous offenses to be admitted, based upon questionable contextuality between the charged and the extraneous offenses. The extraneous offense of the alleged shooting

admitted in the case at bar did not serve to make a fact of consequence more or less probable. See *Alexander v. State*, 88 S.W. 3rd 772, 777-78 (Tex. App.--Corpus Christi 2002, *pet. ref'd*) (holding that the presence of a revolver in the residence where the appellant was arrested was not relevant to any fact of consequence and was thus erroneously admitted). It was highly speculative evidence, with no basis in evidentiary fact that certainly held exceptionally high prejudicial value.   The fact that something might be evidence of a possible motive for a crime, which the Appellant is not conceding, does not make it automatically admissible.   The attempted shooting evidence served no legitimate purpose other than to inflame and prejudice the jurors' minds.   It is questionable that this evidence would have been admissible at the punishment phase of the trial either, because there was insufficient information surrounding the event.

It is a fundamental tenet of our criminal justice system that an accused may be tried only for the offense for which he is charged and not for being a criminal generally. *Reyes v. State*, 69 S.W. 3rd 725, 734 (Tex.App.-- Corpus Christ, 2002) citing *Owens*, 827 S.W. 2nd 914.   Rule 404(b) incorporates this tenet by prohibiting the admission of uncharged misconduct evidence that shows nothing more than the accused's general propensity to commit criminal acts. *Id*. Texas Rule of Evidence 403 states: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." Clearly, this evidence confused and

misled the jury.

Texas Courts have followed their federal counterparts and have interpreted Rule 403 to require exclusion of evidence when prejudice outweighs probative value. *Reyes*, 69 S.W. 3rd 734 citing *Montgomery*, 810 S.W. 2nd 392 (quoting *United States v. Preston*, 608 F. 2nd 626, 639, n. 16 (5th Cir.1979)). The abuse of discretion standard is also applied when a trial court decides to admit evidence over a Rule 403 objection. *Montgomery*, 810 S.W. 2nd 391. This analysis requires more than simply determining whether the trial court conducted a balancing of probativeness and prejudice. *Id.* 392. Instead, the trial court's decision to admit extraneous offense evidence is measured against the relevant criteria by which a Rule 403 decision is to be made. *Id.* When the relevant criteria is viewed objectively and leads to the conclusion that the danger of unfair prejudice substantially outweighed the probative value of the proffered evidence, the appellate court should declare that the trial court erred in failing to exclude it. *Id.*

*The State's Need for the Extraneous Offense Evidence*

Determining the admissibility of extraneous offense evidence focuses not only on the relevance of that evidence, but the State's need for it as well. *Reyes*, 69 S.W. 3rd 734 citing *Montgomery*, 810 S.W. 2nd 392. Although rare, the State's need for the extraneous offense evidence *may* arise as a result of the defendant's case, certainly not in this particular situation. *Reyes* held that, notwithstanding the defendant testified, this did not automatically allow for the admittance of extraneous offense evidence, [especially when there has been no notice

compliance].  It is obvious why the State would want the jury to hear this evidence.

However, their need does not obviate evidentiary admissibility standards.  There must be

more than a mere speculative statement that something occurred.

The Court of Criminal Appeals has opined that a Rule 403 analysis by the trial court

should include, but is not limited to, the following factors:

*Attempted Shooting Evidence*:
(1) how probative is the evidence - The State was not able to show that this incident, if it
occurred at all, had anything to do with any alleged motivation on the part of Cruz to murder
Baxter. The brother's beating occurred well after this alleged incident. Further, the State was
not able to produce any evidence that Cruz had the intent to murder Baxter on the night in
question.  If Cruz actually had the motivation to murder Baxter, why did he leave so many
hours before when Baxter was clearly alive?  This is the type of evidence that this analysis
is designed to prevent;
(2) the potential of the evidence to impress the jury in some irrational, but nevertheless
indelible way - On its face, the prejudicial value of this evidence is apparent.  A side effect
of establishing this evidence was the ever-present "fear factor" on the part of the non-
participatory witnesses;
(3) the time the proponent needs to develop the evidence - The development of this evidence
was quite time consuming, requiring an out of the presence of the jury hearing, as well as
testimony in front of the jury;  and
(4) the proponent's need for the evidence - The State probably felt the need for this type of
evidence because they must have been aware of the weakness of their accomplice witness
corroboration and of their law of parties evidence. But other than "dirtying up" the Appellant
in the hopes of gaining a conviction, the State had no need for this evidence. *Reese v. State*,
33 S.W. 3rd 238 (Tx.Cr.App.2000)

The other extraneous evidence located in the arrest of Cyr and Villarreal was also

quite prejudicial considering it dealt with cell phones, narcotics and weapons.  It certainly

added to the impression that Cruz was a criminal in general and associated with people who

criminals in general.

The trial court's determination to admit the evidence must be reasonable in view of

all relevant facts. *Reese*, 33 S.W. 3rd 240. There is no indication, in the case at bar, that the trial court balanced anything. Earlier in the trial, during the testimony of Detective Bradley, the trial court admonished Bradley to refrain from making references to other murders not the subject of this trial. (R.R. v. 4, p. 58) However, with no more evidence as to the validity of the Marxer testimony, the trial court ruled it was admissible. The trial court has no "right" to be "wrong" if that means to admit evidence which appears to be substantially more prejudicial than probative.

<u>HARM ANALYSIS</u>

The trial court's error in admitting this evidence is a non-constitutional error, therefore, it must be determined whether the Appellant's "substantial rights" were affected by the erroneous ruling. Tex. R. App. P. 44.2(b); *Horton v. State*, 986 S.W. 2nd 297, 303 (Tex. App.--Waco 1999, *no pet.*). "A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict." *King v. State*, 953 S.W. 2nd 266, 271 (Tx.Cr.App. 1997). In analyzing harm under Rule 44.2(b) the entire record is reviewed to determine whether the error had more than a slight influence on the verdict. If it is found that it did, then it must be concluded that the error affected the Appellant's rights in such as way as to require a new trial. If the reviewing court has grave doubts about its effect on the outcome, it should be found that the error was such as to require a new trial. Otherwise, the error will be disregarded. *Horton*, 986 S.W. 2nd 303; *Fowler v. State,* 958 S.W. 2nd 853, 866 (Tex. App.--Waco 1997), *aff'd*, 991 S.W. 2nd 258

(Tx.Cr.App. 1999). In analyzing the weight a jury would probably have placed on the error, a reviewing court will look to other evidence of the Appellant's guilt. *Hughes v. State*, 12 S.W. 3rd 166, 168 (Tex. App.--Fort Worth 2000, *no pet.*).   Previously discussed at length, the evidence only legitimately pointed to Cruz being guilty of aggravated assault.  Hearing that he allegedly attempted to shoot Baxter before the night of his murder would certainly irrationally push the jury over the line to a conviction of murder. [13]  Therefore, the erroneous admission of the extraneous offense evidence had a substantial and injurious effect or influence on the jury's verdict. Consequently, a substantial right was affected.

*Weapons and Narcotics Evidence - Not Contextual*

The evidence located in the arrest of Cyr and Villarreal was not contextual evidence as connected to Cruz.  Same transaction contextual evidence conveys to the trier of fact information essential to understanding the context and circumstances of events which, even though they involve legally separate offenses, are blended together and interwoven. *Camacho v. State*, 864 S.W. 2nd 524, 532 (Tx.Cr.App. 1993).  In other words, the facts and circumstances of the charged offense would make little or no sense if the other offenses were not disclosed, and in narrating one it is necessarily impracticable to avoid describing the other. See *Id.*; *Heiman v. State*, 923 S.W. 2nd 622, 625 (Tex.App.--Houston [1st Dist.] 1995, *pet. ref'd*); *Hodge v. State*, 940 S.W. 2nd 316, 319 (Tex.App.-- Eastland 1997, *pet. ref'd.*); see

---

[13]The charge submitted to the jury in this case was exceptionally confusing, considering all the accomplice witnesses involved and the parties language required.  Having the State hand them something they believed might justify their verdict was probably a relief to them.

*Hankton v. State*, 25 S.W. 3rd 540 (Tex. App. --Houston [1st Dist.] 2000); see also *Carter v. State*, 145 S.W. 3rd 702 (Tex.App. --Dallas, 2004)

Extraneous evidence has to be actually contextual as opposed to theoretically contextual to be admissible. This evidence had no bearing on the allegations contained in the indictment, and did nothing to support the conviction rendered against the Appellant.

## POINT OF ERROR NUMBER FIVE

The State was allowed to engage in the improper bolstering of their witnesses, in violation of the 6th and 14th Amendments to the United States Constitution and Article 1, Section 10 of the Texas Constitution.

### Specific Facts

Detective Bradley testified that the medical examiner pointed out several injuries to him. (R.R. v. 4, p. 11) There was a gunshot wound to the head, a deep laceration, "one of which was actually a skull fracture." The State offered SX 136 which was an autopsy diagram chart. The defense objected to this evidence as inadmissible hearsay and bolstering because Bradley was testifying to what the medical examiner only had the expertise to testify to. (R.R. v. 4, p. 13) In discussing the injuries, Bradley testified "To me, it looked like a deep lac, but I was advised by the doctor it was a skull fracture upon her examination." Bradley further discussed the medical examiner pointed out specific patterns showing that the victim was struck with something that left long cylindrical injuries, so he "guessed" it would have to have been a pipe or a bat. (R.R. v. 4, p. 14) Bradley continued to testify as to his "expert" opinion on the post-mortem injuries. The defense approached the bench, objecting that this

witness' continual testimony was the province of the medical examiner. The defense asked to be allowed to take Bradley on voir dire to better establish his ability to offer this type of testimony. For the second time in the trial, the court did not allow voir dire examination.[14] Continuing to object, the court opined that the police officer can testify to what he saw. All that is fine, however, Bradley was testifying to much more than that, offering opinions that were much more of an expert nature, ascribing his speculative causes for the internal injuries. The trial court did acknowledge that Bradley was "going down that road, so pull it back" seeming to agree that the police officer was testifying in a capacity that he had no expertise on, having overruled the defense objections, however. (R.R. v. 4, p. 15) The defense again objected that all of Bradley's testimony as to how some of the injuries occurred was speculation. This was again overruled. (R.R. v. 4, p. 16) When the defense objected to Bradley testifying that "the doc pointed out....," the Court finally sustained that objection, even though it was no different in substance than the defense's previous objections that had been overruled. (R.R. v. 4, p. 17)

<u>ARGUMENTS AND AUTHORITIES</u>

"Bolstering" occurs when one item of evidence is improperly used by a party to add credence or weight to some earlier unimpeached piece of evidence offered by the same party. *Pless v. State*, 576 S.W. 2nd 83 (Tx.Cr.App.1979); *Johnson v. State*, 737 S.W. 2nd 901, 906 (Tex.App.-- Beaumont 1987, judgment and sentence affirmed as reformed in 784 S.W. 2nd

---

14R.R. v. 3, p. 47 - the prior incident of disallowing voir dire questioning.

47 (Tx.Cr.App.1990)).   Stated differently, "bolstering" refers to any evidence, the sole purpose of which is to convince the trier of fact that a particular witness or source of evidence is worthy of credit, without substantively contributing to making the existence of fact, that is of consequence to the determination of the action, more or less probable than it would be without that evidence. *Williams v. State*, 927 S.W. 2nd 752 (Tex.App. – El Paso, 1996); *Rousseau v. State*, 855 S.W. 2nd 666, 681 (Tx.Cr.App.), *cert. denied*, 510 U.S. 919, 114 S.Ct. 313, 126 L.Ed. 2nd 260 (1993).   The State was aware of problems with Dr. Peacock's testimony in Brian Cyr's trial.   Considering the "flippant" testimony provided by Dr. Peacock, as described by the State during their closing arguments, it is no surprise that they would want a witness that might have greater credibility with the jury describing Baxter's injuries and causes of the injuries.   However, in so doing, the State engaged in prejudicial bolstering, further depriving the Appellant of his constitutional right to a fair trial.

PRAYER

Based on all of the foregoing, the Appellant respectfully requests that this Honorable Court reverse the judgement in the Appellant's case and grant and any other relief which may be appropriate.

Respectfully submitted,

Suzanne Kramer
101 Stumberg
San Antonio, Texas 78204

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing appeal was served on the

District Attorney Office, Appellate Section, 300 Dolorosa, San Antonio, Texas 78204 on

November 18, 2009

_____
Suzanne Kramer